Good morning, all. Our first case for argument this morning is Pecher et al. v. Owens-Illinois. Mr. McCoy. Thank you, Your Honors. Bob McCoy here for the plaintiffs and the appellants in these cases. And I want to start, Judge, by saying that of the six victims that were in these cases, two of them had household exposure as infants and children. Those were Dick Maysapal and Milt Boyer. And of the six who died, two of them developed asbestos-related disease and died much younger than the others. They had an onset age of between 17 to 20 years earlier than the rest, and they died 16 to 26 years earlier than everybody else. Who were those two? That was Dick Maysapal and Milt Boyer, the same two who had the childhood and infant exposures. And that's not a coincidence. That's why a jury needs to consider whether these non-workplace exposures are significant. Because they're not covered by workers' comp? Is that what you're trying to say? That's right. That's a separate point, Your Honor, yes. They're not covered by workers' comp. And the jury might agree with the plaintiffs' experts that these are significant exposures. But the point is that there is a range of exposures that take place. This case is a very classic example of the whole compendium of types of exposures you can experience from asbestos. That's because in part it's six cases, but in part because of the nature of a factory like this that produces asbestos-containing products. And it's not just a situation like in construction maintenance trades. This factory actually produces these products. And as a result of that, there are different scenarios scientifically for the exposures. So if we start with this question, and feel free to ask me whatever Your Honors want, but I would... You can rest assured that will occur. Right. I want to point out, you know, again, that Dick Massapoff, whose case was stricken on summary judgment because the expert's opinion was considered unreliable. He was born in 1954, diagnosed age 59, died age 61. He worked at the plant starting in 1973 until his diagnosis in 2014. But significantly, his father, Emil Massapoff, contributed 12 years of exposure when his father worked in the plant, and Dick was, as an infant, starting in 1954, exposed in that household. And those fibers came home on his father's clothes, not on Dick Massapoff's clothes. And the point is, the importance here of what happens to young children, which was stressed by a couple of the experts, that they actually get greater exposures. They're playing closer to the ground, they're playing harder, they're rolling in those asbestos fibers, and they're spending all their time at home. That's something that needs to be protected, these children. And the point also was made in the testimony concerning Mr. Massapoff, that his father's car was full of dust, and that when you got in his father's car, you could see that dust flying around. Anybody else riding in the car? Yes. Got this problem? That was one of the problems, yes. No, I mean, is there anyone else contaminated by riding around in that car? Everybody who rode in that car would have been contaminated, sure. So they all died? No, not everybody died from mesothelioma. Most people exposed to asbestos do not get mesothelioma because of the, as we described in here, the process is a series of genetic mutations, and if you don't have that series of genetic mutations, you won't get mesothelioma. But we know that's what asbestos triggers, and the questions of who are the unlucky ones is just a matter of that genetic pattern that takes place with those mutations. And this is not a one fiber, you know, you breathe it and that causes your mesothelioma. You have to get a mutation, and then a mutation of that mutation, and a mutation of that mutation. And of course, most cells die, so they don't live long enough to get mutated multiple times. So as a result of that, we have only certain people that are getting the pattern of mutations necessary for mesothelioma. Dick Massapaw was the unlucky one in his family. And I would point this out. I think, I'm not sure this was cited in our brief, but the information about the car appears in Dick's case, which is 14 CV 186. It was at the ECF number 255, which is transcript page 72. The same thing happened in his house with the laundry. The laundry was shaken out by the mother. And again, that also appears in that same ECF 255 transcript in Dick's case, which is pages 69 to 70. That was his own testimony. Which one is that? Dick Massapaw. Same guy, okay. Right. And now I want to turn to Roger Seehafer for a moment. Because Roger, also his case was dismissed for summary judgment. And he worked at the plant for a little less than a year in 1955. And he again worked at the plant from 1963 to 1999. Now remember, the asbestos exposures at this plant stopped for the most part in about 1979, which is when they discontinued the use of asbestos at the facility. So that's what his in-plant exposures were. But importantly here, he delivered, Roger Seehafer delivered milk for somewhere around 30 to 60 minutes every day, seven days a week, for 13 years to a creamery or dairy, which was located two blocks away from the plant. And at this location, visible dust was observed. Well, that must have exposed hundreds of people. That's correct, Your Honor. Anybody else get that? Anybody else infected? Yes. Everybody in that community was affected. No, I mean, it's got, I don't know how to pronounce the name again, mesothelioma. You can call it meso, Your Honor. Well, it took me a long time how to say pneumoconiosis, black lung disease. So this one's got too many syllables. Right. Well, those are both early-on diseases, right, pneumoconiosis. And they're both lung diseases, yes, for the most part. So, yes, the visible dust was observed there. And, again, I don't know we pointed this out in our brief, but the citation on that was as our appendix document number 39, page 3. And that's an entry that was made in a timeline that was prepared by Weyerhaeuser's own environmental manager. Mr. McCoy, with regard to Judge Connolly's ruling in the CEHAFER situation that you speak of, is it true that Mr. Parker and Dr. Anderson, their study suggested that there had to be a minimum residence of one year? I mean, was it applicable to Mr. CEHAFER's situation? Certainly the duration requirement is applicable, Your Honor. No question about that. That is the most important. That is one of the most important factors. The second most important factor, though, when you evaluate exposures of people in a community, is the proximity or closeness, because that factor is what affects the unbundling or dispersion of these fibers. So the closer you are to the point source, the greater the exposure. As you go out from the point source, there's less. So the two factors both combine, yes. No, I appreciate that, but do we really have data from Dr. Anderson or Mr. Parker for Mr. CEHAFER's personal situation? I mean, what they advance, did it cover the kind of traffic he had to the plant and the rest? Well, that's correct, Your Honor. There is no study on point about that type of situation. But that's why this court has allowed extrapolation from similar circumstances, especially when done by highly qualified experts like Dr. Anderson, who was the chief epidemiologist for the state of Wisconsin and had that position for 30 years. And this is a lot based on epidemiological data. He was also the chief medical officer of the state for environmental medicine. That's an environmental exposure. And he was also the chief medical officer for occupational exposures. So he was in a position from personal experience to be able to make this comparison, despite the lack of a particular study. And let me say this. There's no doubt that Judge Connolly's interpretation of the data, that it didn't meet what exactly was in a published study, may be as reasonable. And the jurors would argue about that. They'd all get together and they'd say, well, that's one way of looking at it. But there's another way of looking at it. And at the summary judgment stage, these facts have to be considered most favorable to the plaintiff. And not only that, but the question of what's a substantial exposure under Wisconsin law, which is what we're talking about. I mean, Mr. Seehafer, no doubt, is in visible dust on this record. He's carrying heavy milk cartons every day through that visible dust. He's kicking it up. He's breathing it. But whether that's substantial in his overall exposure history is a question for the jury. And that's where Judge Connolly, with all his efforts, and I grant a 62-page opinion is a lot of effort, just went too far in making that final decision. Because the question of what's substantial has to be going to the jury. And the questions of the underpinnings of this factual data is also one that's not for the gatekeeper role of Dauber. Dr. Anderson applied the proper methodology by considering all these different studies and the principles of asbestos fibers, which is really what these studies are about, how they travel and get up in the air and unbundle and the dispersing of those. And he applied that methodology. That's where Judge Connolly agreed. And at that point, he should have stopped and said, okay, the rest of it's up to you, Dr. Anderson, to form your opinion, and it's up to the jury to decide it, and it's up to the defense counsel to do their cross-examination as to whether that data is applicable or not. Mr. McCoy, the argument about whether the exposure, the community-type exposure, was significant, that argument was made for the first time in the motion for reconsideration. Is that right? That's not correct, Judge. No, the data about the exposures, which is primarily through the expert reports, was submitted. That data was presented as part of the original response to the motion for summary judgment. What we did in the motion to reconsider was just to flesh out that same data in a little greater detail and put some numbers on it, but it was the same data. No, I understand about the data, but did you actually make the argument about the significant exposure prior to the motion to reconsideration? Definitely, yes. We argued that the community exposures from Mr. Seehafer were significant from delivering the milk. And remember here on this record that we also have about four or five witnesses who observed visible dust in the community five or six blocks away. Here we've got somebody who's two blocks away. So, again, this should be something for the juries to decide, and I'd like to, if Your Honor's finished, certainly if you have more questions, ask me on Mr. Seehafer. No, no, that's fine. But I'd like to move to Ms. Rita Troitil's case for a moment. And she was diagnosed at age 85. She died at age 85. Her husband, well, let me start with her. She worked at the plant from 1966 to 1984. Two of her years were in production work, but the rest of her time was as a clerk or a secretary in the detail department. She was not a production worker for most of her time. She was often in the office areas. And I say that because her husband had far more exposures in terms of years at the plant, and he worked there from 1946, which is about the time of their marriage, until 1984, in the fabrication areas of the plant where there was actually the cutting and sawing. Mostly it was the veneer department, but this was directly adjacent to the core mill. And he came home with visible dust of the same color as this mineral core dust that had the asbestos in it on his clothes. So in her situation, again, the comparison has to be drawn between the exposures that she got from his household presence and what she got at work. The substantiality factor has to be looked at by the jury. And once again, Judge Connolly crossed his role as gatekeeper and went into the area of finding facts. Mr. Kite, I appreciate the factual basis you're presenting for the various plaintiffs. But I think speaking about being a gatekeeper, could you speak to the issue of the private nuisance claims? Private nuisance claims? Yeah, the suggestion by Weyerhaeuser that you avoid that. The private nuisance claims, of course, were pled in the complaint. They were the subject originally of a motion to dismiss that was filed by Weyerhaeuser. And that was ultimately the judge ruled in our favor on that motion to dismiss as to the private nuisance claims. Judge Connolly did. They were raised again in the summary judgment motions. And the argument was presented that there was a requirement of a current possessory interest. Right, that's what I'd like you to focus on, the possessory interest issue. Meaning at the time that the person brought the claim, they were living in the property still. The response to that summary judgment motion was that the proper law in Wisconsin is the Metropolitan Sewerage District case. Let me pull out my note on that. Milwaukee Metropolitan Sewerage District case, which was 205WI-8. And that case and the standard was cited in the response brief. The only thing that wasn't done was to say, oh, the defense standard is nonsense. We didn't say that because the response was to cite the proper standard and to say that's the one that should be considered. So there was no waiver because this was made in a response brief. This didn't come up for the first time, the proper standard in a motion to reconsider. We also cited there the restatement of torts in the response brief, which was where the Milwaukee Metropolitan Sewerage District case gets its standard about the right to current enjoyment and use, and there's no requirement in there of a current right. So that's what I would say on the waiver point. Because the proper standard was cited in the response brief, there can't be any waiver. I wanted to add, Judge, the citations I gave you about the secretarial work of Ms. Treudel, I'm not sure, again, if those appeared in the brief sites, but they appear in the documents in the record. I would point again to, in her case, Ms. Treudel's case, which is 12CV 899, ECF document number 83, and within that document, pages 73 to 75, talk about her role as a clerk. Also, I would point to, in the same case, 12CV 899, her case, document number 229, which has the request for admission of facts, proposed facts, I should say, and fact number 16 is that same information. And I'd like to move on just briefly to add the point, Judge, that in Wisconsin law, feel free to ask me whatever questions you need to along the way here, but under Wisconsin law, the causation in asbestos cases has been determined in two cases, at the summary judgment stage, actually I should say in three cases at the summary judgment stage, by the Wisconsin Courts of Appeals. The two published decisions under Zielinski and Horak, which are discussed in our brief, both those two cases stand for the proposition that where you have competing exposures, it's not a question of what the quantity of those exposures are at the summary judgment stage. That's ultimately for the jury to decide whether they're substantial or not, but it's the evidence that those exposures probably occurred, and that's the standard that Wisconsin follows in whether something should be allowed at the summary judgment stage. So if these exposures probably occurred, then the cases should go forward to the jury for decision on these. And, of course, the Wisconsin standard, as in many states, is that an exposure does not have to be the cause but only needs to be a cause. And I would take that a step further in the Cowerts case, which was cited in our reply brief. And the Cowerts case, which was not a fully published decision, but under Wisconsin rules can be cited not as precedent but as persuasive authority, if one can see where that distinction is, but that's what they say. The Cowerts case is very similar in that it involves a lot of these kinds of circumstantial exposures where people were bystanders and those exposures were deemed sufficient to go to the jury for the same reasons based on the standards of Zolensky and Horak cases, that Wisconsin requires that there be evidence of the exposure, not that it has to be absolutely proven at the summary judgment stage or quantified. Are those exposures you're talking about other than workplace? Is that what your point is? I'm talking about, yes, the non-workplace exposures, but I'm also talking about the workplace exposures too, the ones that would result in bystander exposures to people bringing home the fibers on their clothing who are family members. And Judge Connolly's ruling allowed those family member exposures to go forward to the jury, providing that they were proven to be significant, and then he found in two of the cases that they were not substantial, which is where I've already mentioned the line should have been drawn and he should have stopped and just made the determination about the importance of the significance and shouldn't have evaluated these exposures as a fact finder. But he did determine that the family member exposures should go forward, and I believe that's a position under the law that would be proper for one view on the workers' comp act bar, that the family household members can go forward. But the victim's own take-home exposures, he said, could not go forward. That's where he drew the line on the law. And I say this because the plaintiff's position in this case was and still is that even the family member's household, I'm sorry, the victim's own take-home exposures on their own clothing is properly considered by the jury. That there was another decision we pointed to. I think it's at page 63 of our brief. I see my white lights on, so I probably should stop. But footnote 44, where the judge, trial judge, in another case from another fireproofing plant, said that the victim's exposures on their own clothing should go forward because there's no evidence of rules about workplace laundry and so on that would affect the home laundering situation. So, again, in the absence of the record on that point, our position is the victim's own exposure should go forward. So I'll sit down here. Okay, thank you, Mr. McCoy. Mr. Riley? Thank you, Your Honor. Robert Riley for Owens, Illinois. I've never quite been in this situation. Nothing that Mr. McCoy said has any relevance whatsoever to the claim against my client or the issue that's on appeal with respect to my client. And the reason for that is simple. In the trial court, he alleged that some of the products used in this warehouse or plant were made by my client. We had discovery on that issue. We proved the negative. We filed a summary judgment motion. And Mr. McCoy voluntarily dismissed with prejudice the claim against my client. We are not the source of any, a single asbestos fiber in this plant in this case. The sole basis upon which he tried to keep us in the case, notwithstanding that, was that we got a patent on an idea. And we licensed that patent. And that patent, we licensed it to Weyerhaeuser, and it had to do with how to construct the interior of a door. That's all. We won in the trial court because no case anywhere in Wisconsin or anywhere else has held that you can impose tort liability on a mere patent licensor. The 11th Circuit has expressly said you cannot. The Supreme Court of Texas has expressly said you cannot. But the plaintiff cannot cite a single case that says that is a basis for tort liability, and there's a very good reason for that. It is axiomatic that a patent is merely designed to protect an idea. It's not a product. It doesn't give you the right to make a product. It merely protects you from somebody using your idea. If they infringe, you have a right to protect your idea. No court has said that if you get a patent on your idea, that makes you a product manufacturer or a product designer, for that matter. Judge Connolly ruled, consistent with the foregoing, that there just isn't a tort claim against a mere patent licensor, and that is all we are alleged to be here. Judge Connolly is not the only federal judge in Wisconsin that has addressed the argument of the plaintiff here that somehow you can simply make up this obligation under tort law by saying, well, it should have been foreseeable to the patent licensor that Weyerhaeuser would use asbestos and wouldn't control asbestos. Well, you actually even in patent said preferably, but you didn't require asbestos. Did not require it, and it said so outside the claims portion of the patent, which is the only legally operative portion of a patent. And the licensing agreement makes no reference at all to asbestos. And we know Weyerhaeuser was using asbestos core made by other defendants, because we had to chase down all that evidence in this case, long before they ever licensed the patent. So there's not even a claim that we gave them the idea. It wouldn't have been a patentable idea. The only patentable idea had to do with how to configure pieces of the core in such a way as to withstand heat. Mr. McCoy made the very same argument about foreseeability is enough to create this legal obligation before Judge Crabb in the Moss case, and we cite that at page 36 of our brief. She called that theory misguided. She noted that an individual does not have an obligation to prevent harms, even if they're foreseeable harms, unless those harms are in some way attributable to the individual's conduct. Here it would have to be attributable to us in our status as patent licensor, and that's the flaw. The flaw in the Moss case was it was somebody who made a piece of equipment that didn't have any asbestos on it. Mr. McCoy's claim in that case was, well, it would be foreseeable somebody could use an asbestos-containing product with a piece of equipment. Judge Crabb said, no, no, no. That is not the basis for a legal obligation. The ramifications of the rule of law being advocated by Mr. McCoy would be tremendous. It would turn patent law and product liability law upside down. There are well over a million live patents out there, and I looked it up in 2015. The patent office issued over 300,000 patents in one year. Under this theory, every one of those patent donors has potential tort liability for anything that in retrospect is alleged to have been foreseeable about the use of the idea by somebody else. Clearly not within the control of the patent holder. The patent doesn't give you the right to tell Weyerhaeuser what to do or what not to do or how to run its plant or how to control its dust. It would impose absolute liability on every patent holder if that theory were embraced, and I would argue respectfully that's why no court has embraced it. It would inhibit the goals of the patent laws to encourage innovation and publication of ideas in exchange for protection of those ideas if they're infringed, and it would create un-cabin tort liability. There's a reason there is no authority to support the position. I respectfully submit there's a reason this point wasn't argued. I will cede. Unless there are questions, I'll cede the balance of my time. Thank you, Mr. Riley. Thank you. Mr. Mulholland? Good morning. Danny Mulholland for Weyerhaeuser. The three decedents in these cases, and our cases are Mesafol, Seehafer, and Troitle. The three decedents all had and all died from mesothelioma, which is and was, in their case, an occupational disease. Their mesotheliomas were substantially caused by their in-plant asbestos exposure during their decades-long employment at the Weyerhaeuser facility in Marshville, Wisconsin. That's undisputed. Wisconsin has a Workers' Compensation Act, which provides a remedy to workers, and in return for that remedy, if they have an occupational disease or an occupational injury, it provides that the employer must provide benefits, and in return the employer is immune from tort liability. Weyerhaeuser had immunity from tort liability for the occupational diseases, the mesotheliomas, of these three decedents. That's undisputed. So frankly, the complete answer to this entire case from Weyerhaeuser's point of view is simply this. It's barred by workers' comp immunity, and that's it. Now, I'm going to gill the lily and talk about some things that don't matter, but everything I'm about to say doesn't matter because workers' comp immunity applies. First, there are alleged concurrent causes for the mesotheliomas in this case. Household exposures, community exposures, household exposures from the workers' own clothes, household exposures from the workers' family members' clothes. Those don't matter. Wisconsin recognizes that regardless of whether there are concurrent causes of an occupational disease, if there is an occupational disease, it's covered by the workers' comp act. Is that because it traces back to the worker? Yes. The original source that may have been spread around subsequently originates with the employer? Yes, it's because the disease is caused at least in part, if not in total, by the employer's occupation. It's not a separate injury? Not a separate injury. There's one injury in this case, mesothelioma. Now, there are cases on that, and we cite them. Lange is the case in our brief that specifically deals with that. There's a more recent case which we don't cite, AgriLink Foods' Wisconsin appellate case, recognizes that there may be concurrent causes to a disease, but if one of them is occupational, then the workers' comp act applies, the worker gets benefits, and the employer gets immunity. That's part of the bargain of workers' compensation. In this regard, it should be noted that Wisconsin adamantly says that the workers' comp act should be interpreted to provide, where possible and appropriate, benefits for an injured employee. Now, there was argument in the brief that the manifestation of this mesothelioma, or these mesotheliomas, did not occur until long after these people either went home for the day or quit working or whatever. Well, that doesn't matter, and the reason that doesn't matter is twofold. One, Wisconsin, its workers' comp act, defines injury to be both an injury and a disease, so it specifically covers occupational diseases, and occupational diseases don't just manifest during the course of the day. Typically, they arise, they're chronic, and they arise over a long period of time. And secondly, the act deems the manifestation or the date of the injury of the occupational disease as the last day of work for the last employer whose employment caused disability. So under the express terms of the statute, the Wisconsin legislature said, you know, we're not going to argue about the timing of this, we're just going to deem it as to be a time, the last day of the last employment in issue. For that reason, there are a string of cases holding occupational diseases like asbestosis and mesothelioma and a related disease, silicosis, as being covered occupational diseases under the Wisconsin Workers' Comp Act. All of this is undisputed. We cite these cases in our brief. SOFA versus Johnson Insulating is a mesothelioma case. So there's really not any dispute about this. The plaintiffs argued in their reply brief that we should have filed a cross appeal. That's not right. We haven't had a chance to respond to this. I can cite a whole list of cases, but I'll just cite one. And that's Marcatante versus City of Chicago. It's a Seventh Circuit 2011 case. It holds that we're appellees, we won in the trial court. It holds that it is improper to file a cross appeal to merely assert an alternative ground of affirmance. When appellees are arguing alternative grounds of affirmance, they can do so in their response brief. That's what we did here. We won the issue of workers' comp immunity at the trial court as to the decedent's own clothing. The community exposure and the family member clothing, we actually won those too, but on different grounds. But the workers' comp immunity applies to them all and is the complete answer to this case. Now, in order for us to be in a position to argue these alternative grounds, it was necessary that they were adequately considered by the district court and that the plaintiffs had an opportunity to contest them. That's the Grosz-Yosinski case. That's absolutely clear that we satisfy both of those requirements. As we note in our brief, we filed motions to dismiss and motions for summary judgment, seeking dismissal and summary judgment as to all of the claims based on workers' comp immunity. In the Mesafold case, those are the ECF docket numbers 33, 75, 257, and 392. It is clear that the district court considered these motions, considered our arguments. In fact, originally the district court dismissed all of the claims based on workers' comp immunity. Now, he did permit the plaintiffs to amend, and in the course of that amendment, we never quite got back to the original place where we were, but the law didn't change. They're still barred by workers' comp immunity. So clearly this is a live issue on appeal, first, and secondly, workers' comp immunity applies. Now, as far as we could tell, this precise factual issue, that is a take-home exposure of asbestos by family members or the workers themselves or community exposure, had never come up in Wisconsin before. That's what the district judge concluded. But it is not novel, and it is not, in our opinion, difficult, because it has come up in a bunch of other places, and we cite these in our brief. This very issue has come up in terms of nuclear material in the Silkwood case, in terms of asbestos, in the Acevedo and Swanson cases, both cited in our brief, and in particular, in the Melendrez case, the California pellet decision was decided during the course of the arguments on these issues, which we think is particularly instructive for a couple of reasons. One, well, first, all those cases held, those don't create a separate cause of action, a separate tort liability against an employer that exists somewhere outside of workers' comp immunity, provided that the original exposures arose out of employment. In Melendrez, the court noted, in particular, that we're talking about one injury here, and that injury is a mesothelioma, a fatal mesothelioma. And if that injury is covered by the Workers' Comp Act, and it is here, it was in each of these cases, then there is no other liability that Weyerhaeuser can have, because that's the bargain under the Wisconsin Workers' Comp Act. That's important because the California Workers' Comp Act, which governed the Melendrez case, was based on the Wisconsin Workers' Comp Act, way back, a century ago almost. And Wisconsin courts oftentimes cite California courts on issues regarding the meaning or the application of the Wisconsin Workers' Comp Act. And we think that case is particularly instructive as to what the result ought to be in this case. Now, the plaintiffs in their brief cited what I called... This term wasn't used, but when I started practicing law, it was called frolic cases, where workers were out doing their own thing and got hurt, or maybe distracted from their employment, and the question was whether that was covered under the Workers' Comp Act. This isn't a frolic case. There's no question but that these plaintiffs had decades of exposure to asbestos during their employment and contracted mesothelioma. They had occupational diseases. So those frolic cases are just simply inapplicable. Well, a product case, you'd have to, you know, if it's a product. Obviously, if you're an injury on the job for that product, they go externally and show that it's improper design of that particular product. So that's a separate claim. You're saying you can't separate it. You can't separate. Actually, just then I was speaking of frolic cases, but in terms of employer... The question, as I understand what you're asking me, is can an employee state a product's liability claim against his employer? The answer to that is no, not if the injury is covered under the Workers' Comp Act. You go to the manufacturer of the product. That's correct. Now, the district court properly excluded... Well, first, that's the answer to all the other issues, or an answer to all the other issues. That's dispositive of this case. The district court also granted summary judgment based on its first ruling under Daubert that the plaintiff's expert's testimony should be excluded. Of course, the court knows that the Daubert framework, whether or not the correct framework was applied, is a question of law. It's reviewed de novo. But the court's application of that framework, determining whether or not in its role as gatekeeper that was met, is not a question of law. It's an abuse of discretion standard. And as this court noted in, I believe, the Textron case, and certainly the Irvin case, that discretion's pretty wide. Now, let's talk about Seehafer, which is the community exposure case. That's where the allegation is that asbestos dust left the plant and somehow contaminated Mr. Seehafer while he was delivering milk at the creamery. Well, as we demonstrated in our brief, and as the district court held, plaintiff's expert said there was a zone of risk. You had to be within 1.25 miles of that plant for a year. Well, as the district court also properly held, the plaintiff's couldn't, under Textron, extrapolate to get to Mr. Seehafer because Mr. Seehafer didn't satisfy those conditions. And that's why the judge excluded the testimony as far as Mr. Seehafer is concerned. Now, the plaintiff's then moved to reconsider and for the first time made a back-of-the-napkin calculation about his deliveries to this creamery that even though he didn't live near, even in Marshville, they said, well, that satisfies it. That's enough for the extrapolation to include Mr. Seehafer. The problem with that is that calculation was not performed or offered until the motion for reconsideration, and that's too late. Secondly, that calculation was not in any of the plaintiff's expert reports. That's why it didn't come in until something they thought up afterwards. And further, the plaintiff's admit that there is no peer-reviewed or published study  from somebody who's driving into an area and then driving out even on a regular basis. Now, under that scenario, the motion for reconsideration is definitely reviewed under an abuse of discretion standard. The court denied it, and no abuse of discretion has been shown, nor could it be shown, because as it turns out, Mr. Seehafer doesn't even satisfy the conditions set up by the plaintiff's experts. Now, um, it's a little bit different analysis for Mr. Masifo and Ms. Tweddle's claim, but it's essentially the same thing. The district court said, look, we can't say every exposure is enough to satisfy the requirements of Dauber. Even the plaintiffs agree with that. So the court applied the plaintiff's own experts' methodology and said, you can't even give me a scientific basis for finding that these people had sufficient exposure to asbestos. In particular, there was no evidence that Mrs. Masifo's father worked with asbestos, and there was no evidence that Mrs. Tweddle's husband worked with asbestos, and it's not good enough just to say they were in the plan at some point doing whatever it is they were doing. You had to show something. The plaintiffs needed to come with something to be able to say, well, they're within the zone of danger. And, of course, the daughter only worked a summer, and that did not satisfy the one-year requirement that, again, was not the district court's idea, but the plaintiff's experts' idea. Mr. Milholland? Yes. Judge Connolly obviously did a lot of work in this case, and he may have had some sound reasons for questioning the methodology of the experts here, but are his reasons self-evident in his order on the... with regard to his Daubert analysis? I believe they are, Your Honor, as I understand your question. Certainly, in Mr. Seehafer's case... No, I understand there. I'm thinking more about the individual we were just talking about, Mr.... Mesafolo? Troilo? Yeah. The issue, I believe, the answer to your question is yes, and the reason I say that is this. There is or was a huge dispute in this case as to whether or not every exposure, every fiber, cumulative exposure type of testimony would fly. The law is building in this circuit and elsewhere that that's not going to be good enough, and the plaintiffs said they were distancing themselves from that. However, when you look at their experts' testimony, it collapses into every exposure, every fiber and cumulative exposure type testimony. The district court explained in his opinion that there must be something to demonstrate the significance of an exposure such that it could be a substantial cause, and the court looked to the plaintiff's experts, in his opinion, to discern what that significant exposure must be, and it had to be something other than every fiber. So you think a fair reading of the record then supports that his reasoning is apparent? Yes. I'd ask you to further something along that line because it seems that you've seen them too. Everybody has, I guess. These call 800 number if you have this disease. Yes, Your Honor. And apparently what goes on with that is when you find someone with that disease, you meaning somebody, a lawyer, whoever advertises, they have to trace back, and I wonder if there are any when they trace back they can't find an employer. For instance, I grew up on a farm, and I don't know what's buried in some of those old buildings that were torn down. I don't know where asbestos comes in in a lot of products. Maybe something fell off of a truck and somebody was exposed to it and never paid any attention to it until 20 years later when they got this disease. Are there any dead-end diseases when they do that kind of advertising? I know you've studied a lot about this, where you can't find a source. Yes. There is something known as idiopathic mesothelioma where there is no apparent source, nobody can find a source that can be blamed for a disease. Obviously those aren't these cases because these people had decades of exposure. But they know they have a source. That's what they're going into. That's why I'm mostly curious about it. It seems that when you advertise for something like this, some lawyers do, personal injury lawyers, they do things like that, and would come up with a dead end. If somebody definitely has the disease and they don't know where they got it 20 or 30 years ago. If you don't know, that's all right. There are cases where, and that's usually disputed because in the adversarial system, without being too cynical, usually there's going to be a suggestion that it's traceable to an employer or a product somewhere along the way. But there are the rare cases where there is no apparent cause, as there was an apparent cause in these cases. All right. Thank you. Thank you, Mr. Mulholland. Mr. McCoy. Thank you. The Owens, Illinois scenario, what we're asking for here is not a final finding. This came up on a motion to dismiss in the trial court. All we're asking for on Owens, Illinois is that this case be sent back for development of a proper record on the public policy questions. And in that regards, the Alvarado case was one case we didn't mention in our brief. I wanted to point that out now. This is a Wisconsin Supreme Court decision. 2003, Wisconsin, or WI-55. And in that case, the court said, in most cases, this is paragraph 18 of that decision, in most cases, the better practice is to submit the case to the jury before determining whether public policy considerations preclude liability. Only in cases where the facts are simple and there's no disputed facts should the determinations be made at the 12B6 stage. Is this a case that's not in your briefs? It wasn't cited in our brief. We had something similar on this same point about the timing of public policy in Wisconsin, but I wanted to add that case. Yeah, well, we do require that you notice the other opponent on that. Not from the podium, but... Right. I can submit it as supplemental authority. I'll do that. I think that's the appropriate... And what type of case was that? What's the factual basis of that case? That case came up in the similar context of... Of a patent? No, it wasn't a patent, but it's a statement of how Wisconsin courts view the question of determining negligence responsibility. Yeah, well... Right. Our situation here involves a patent. Yes, right, involves a patent, and it involves a company who, according to the allegations of the complaint that must be accepted as true, knew it was foreseeable that that design would harm people, knew it was foreseeable that that design would release fibers into the air. So with that knowledge and that statement of foreseeable harm, and there is nothing in the public policy of Wisconsin that would say in any decision that you would have no liability in that scenario. That doesn't mean there is, but that means it should go forward for further discovery and maybe to a jury. Well, would you agree with Mr. Riley that we're not really... We don't really have a lot of authority along those lines? We don't have a lot of case law discussing purely patent law. Right. But this case really isn't about patent law. It's about the negligence of the designer, and that case law has been established many times that designers have effectively the same responsibilities as manufacturers when they have this foreseeable knowledge of the harm. And we have a toxin here that's killing people. In 1947, Wisconsin had law saying that asbestos was a toxic substance that would kill people. That's eight years before this patent was licensed. So what we really have here, we're not questioning the patent ownership rights, which is what patent law is about. What we're questioning is if you do own a patent, what is your safety responsibilities when you make money from licensing that patent? And that's no different than when you make money from selling the product. Are you supposed to put warnings out with the patent? You could put a warning in your patent. We could do a lot of things. Is that something that's done? You could put a warning in your patent. You could put a warning in the contract when you license the patent. There's all kinds of ways to put warnings out, and that's the point is that question should go back for further evaluation as to whether there was a public policy that you don't have to put warnings on patents. That's the point, is there something here we don't know because it wasn't developed in the record, but Wisconsin law requires further development, and that's what's missing here. So we're asking for remand to develop that record, just like Your Honor asked about when it's appropriate to put warnings on substances. I would add... That would be something above and beyond most patents. It might be. I wouldn't say that it needed to be in the patent. I'm saying it could be in the contract when you license it. But for instance, we have one precedent that we cited out of the Northern District of Illinois, the Dolan case, where a patent holder was held responsible. I don't think other than that there's been really any cases that look at a pure design question here. But that doesn't stop, again, the question of negligence in Wisconsin law where you presume that you're liable and responsible to the world, and you have to get to the public policy issues that weren't developed in the record below. You could have a shell company that just owns patents and has no liability. That's the point. That's the other side of the public policy. You could protect any patent holder from their manufacturing just by creating a shell company that licenses the patents. I want to just add one more thing because my time's up, and that is, again, Judge Connolly did not find that the Workers' Comp Act in Wisconsin barred all the claims. He only found that the household claims were barred. And there's no case in Wisconsin where an employee who is not performing their work duties is held to have a Workers' Comp remedy. That should not be extended under Wisconsin law to non-employment situations. These household activities had to occur. They weren't work activities. There's no rules about laundry or clothes that would dictate any involvement in households. Thank you. Mr. McCoy, before you sit down, this is a serious case, but I want to make a comment about your Certificate of Compliance with the type and volume limitation in your brief. You indicate and you certify how many words it was, but let me give you an example of your record citation. There's a four-line record citation that counts as one word the way you set it out. No spacing. It would have been 68 words if it had been spaced properly. You've done the same thing with your case citations constantly throughout. There's no spaces. You know it. They're not spaced the way they normally are. And, for example, that makes a difference. It doubles the number of words. So you've not been forthright in how you certified this. I certainly apologize, Your Honor, for our citation formats. And we did move for additional words on this briefing because it was six cases. I know you did. But you also fudged it when it came to actually typing. But that's all I had. That's the comment. It's a serious case, but I'm telling you, you certainly could be subject to sanctions for it. But, nevertheless, it's not that we don't notice those things. And it does have an impact on how we review your case. So I would suggest in the future you not do that. That's all. I understand, Your Honor. All right. Our thanks also to Mr. Riley, Mr. Mulholland, and all counsel. The case is taken under advisement, and the court will proceed to the assessment.